342 Conn. 445     MARCH, 2022     445

State *v.* Patel

# STATE OF CONNECTICUT *v.* HIRAL M. PATEL
## (SC 20446)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Convicted of various crimes, including murder, in connection with a home invasion, the defendant appealed, claiming, inter alia, that the trial court had improperly admitted into evidence a dual inculpatory statement made by a codefendant, C, to E, a fellow prison inmate. The defendant's cousin, N, had included the defendant and C in N's plan to rob the victim, with whom N had previously engaged in drug transactions. N drove the defendant and C to the area of the victim's home, which the defendant and C eventually entered. After encountering the victim, C shot and killed him. While in custody on an unrelated charge, C recounted the events of the home invasion, including the defendant's role, to E, who surreptitiously recorded the conversation. At trial, the recording of C's conversation with E was admitted as a statement against penal interest under the applicable provision (§ 8-6 (4)) of the Connecticut Code of Evidence. In addition, defense counsel, in order to advance a theory of third-party culpability, sought to have the defendant's sister, M, testify about a purported confession that P, N's cousin, made to M. The trial court excluded M's testimony regarding P's confession on the ground that it was not sufficiently trustworthy. The Appellate Court affirmed the judgment of conviction, and the defendant, on the granting of certification, appealed to this court. *Held*:

1. The Appellate Court correctly concluded that the trial court had not abused its discretion in admitting into evidence C's dual inculpatory statement to E:

   a. The admission of C's statement did not violate the defendant's right to confrontation under the United States constitution: in *Crawford* v. *United States* (541 U.S. 36), the United States Supreme Court indicated that statements of a defendant's coconspirator to a fellow inmate inculpating the defendant are nontestimonial, and, subsequently, federal and state courts have consistently rejected claims that the admission of statements between inmates or between an inmate and an informant that inculpate a defendant violate the defendant's right to confrontation; moreover, in determining whether the admission of such statements implicates a defendant's right to confrontation, courts have undertaken an objective analysis of the circumstances surrounding the making of the statements and the encounter during which they were made in order to assess the primary purpose and degree of formality of that encounter; in the present case, C's statement to E was elicited under circumstances in which the objectively manifested purpose of the encounter was not

State *v.* Patel

to secure testimony for trial, as C made his statement in an informal setting, namely, his prison cell, to his cellmate, E, who questioned C in a sufficiently casual manner to avoid alerting C that C's statement was going to be relayed to law enforcement.

b. The admission of C's statement did not violate the defendant's confrontation rights under article first, § 8, of the Connecticut constitution: although the defendant urged this court to depart from the federal standard and to hold, under the state constitution, that a statement qualifies as testimonial if the reasonable expectation of either the declarant or the interrogator/listener is to prove past events potentially relevant to a later criminal prosecution, this court was not convinced that the defendant established the necessary predicates for departing from the federal standard, as an analysis under the six factors set forth in *State* v. *Geisler* (222 Conn. 672) did not support a more protective interpretation under the state constitution; moreover, although this court noted that it might be compelled to reach a different result under a slight variation of the facts, in the present case, the court had a fair assurance that government officials did not influence the content or the making of C's statement, as there was no evidence to suggest any involvement by the state's attorney's office in orchestrating the inquiry or that the police coached E on what questions to ask or what facts they were seeking to learn, and, because the conversation between C and E was recorded, the trial court could ascertain the extent to which, if any, C's answers may have been shaped or coerced by E.

c. The trial court did not abuse its discretion in admitting C's statement under § 8-6 (4) of the Connecticut Code of Evidence as a statement against penal interest: although the fact that the statement was made thirteen months after the commission of the crimes weighed against its admission, and although E and C, who were fellow inmates for only a short period of time, did not share the type of relationship that would support the statement's trustworthiness, C's account of the home invasion was consistent with the physical evidence in almost all material respects, the statement was clearly against C's penal interest, as he cast himself as the principal actor in the commission of the crimes, and C's statement and the circumstances surrounding the making of that statement had none of the characteristics that historically has caused courts to view dual inculpatory statements as presumptively unreliable when offered to prove the guilt of a declarant's accomplice.

2. The Appellate Court correctly concluded that the trial court had properly excluded P's confession to M, which the defendant attempted to offer through M's testimony as a statement against penal interest under § 8-6 (4): the trial court reasonably concluded that P's purported confession, in which he admitted that it was he, and not the defendant, who accompanied C into the victim's home, was not sufficiently trustworthy to be admitted as a statement against penal interest, as much of the evidence that the defendant characterized as corroborative indicated only that P

342 Conn. 445 MARCH, 2022 447

State *v.* Patel

may have played some role in connection with the home invasion, not that P had been present in the victim's home; moreover, P's confession was made more than one year after the incident, and M claimed to have told no one except the defendant about P's confession for more than three and one-half years after P made the confession, delays that provided M with the opportunity to learn of the details of the prosecution's theory of the case.

Argued February 22, 2021—officially released March 22, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, murder, home invasion, burglary in the first degree as an accessory, robbery in the first degree as an accessory, conspiracy to commit robbery in the first degree, conspiracy to commit burglary in the first degree, and tampering with physical evidence, brought to the Superior Court in the judicial district of Litchfield and tried to the jury before *Danaher, J.*; thereafter, the court denied the defendant's motions to preclude certain evidence; verdict of guilty; subsequently, the court, *Danaher, J.*, granted the defendant's motion to vacate the verdict as to the charge of felony murder and vacated the verdict as to the charge of conspiracy to commit robbery in the first degree; judgment of guilty of murder, home invasion, burglary in the first degree as an accessory, robbery in the first degree as an accessory, conspiracy to commit burglary in the first degree, and tampering with physical evidence, from which the defendant appealed to this court; subsequently, the case was transferred to the Appellate Court, *Alvord, Bright* and *Bear, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Richard Emanuel*, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with whom, on the brief, was *Dawn Gallo*, state's attorney, for the appellee (state).

State *v.* Patel

*Opinion*

KAHN, J. Following a jury trial, the defendant, Hiral M. Patel, was convicted of murder in violation of General Statutes § 53a-54a, home invasion in violation of General Statutes § 53a-100aa (a) (1), burglary in the first degree as an accessory in violation of General Statutes §§ 53a-101 (a) (1) and 53a-8 (a), robbery in the first degree as an accessory in violation of General Statutes §§ 53a-134 (a) (2) and 53a-8 (a), conspiracy to commit burglary in the first degree in violation of § 53a-101 (a) (1) and General Statutes § 53a-48, and tampering with physical evidence in violation of General Statutes (Rev. to 2011) § 53a-155 (a) (1).[1] The Appellate Court affirmed the judgment of conviction; *State* v. *Patel*, 194 Conn. App. 245, 250, 301, 221 A.3d 45 (2019); and we thereafter granted the defendant's petition for certification to appeal. See *State* v. *Patel*, 334 Conn. 921, 223 A.3d 60 (2020). The defendant's principal challenge relates to the admission into evidence of a codefendant's recorded dual inculpatory statement[2] to a fellow inmate acting at the behest of the state police. The defendant contends that the Appellate Court incorrectly concluded that the statement was nontestimonial and, therefore, did not implicate the defendant's confrontation rights under either the United States constitution or the Connecticut constitution, and that the trial court properly admitted it under the hearsay exception for statements against penal interest. We disagree with the defendant's claims and affirm the Appellate Court's judgment.

[1] The defendant also was convicted of felony murder in violation of General Statutes § 53a-54c and conspiracy to commit robbery in the first degree in violation of §§ 53a-134 (a) (2) and 53a-48. The trial court vacated his convictions on those charges to avoid double jeopardy concerns.

[2] "A dual inculpatory statement is a statement that inculpates both the declarant and a third party, in this case the defendant." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 359, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

State *v.* Patel

The Appellate Court's decision sets forth the following facts that the jury reasonably could have found. "On June 12, 2012, [the] police arrested Niraj Patel (Niraj), the defendant's cousin, after a motor vehicle stop . . . . [Niraj] was charged with criminal attempt to possess more than four ounces of marijuana, interfering with an officer, tampering with evidence, possession of drug paraphernalia, and motor vehicle charges. Following his arrest, Niraj unsuccessfully attempted to borrow money . . . to pay his attorney.

"Niraj thereafter formed a plan to rob Luke Vitalis, a marijuana dealer with whom Niraj had conducted drug transactions. Vitalis lived with his mother, Rita G. Vitalis . . . in Sharon. [Niraj offered money to Michael Calabrese, a friend, and the defendant to perform the robbery.]

"Niraj knew that Vitalis had sold ten pounds of marijuana from his home on August 5, 2012, and set up a transaction with Vitalis for the following day, with the intention of robbing Vitalis of his proceeds of the previous sale. On August 6, 2012, Niraj drove Calabrese and the defendant to the area of Vitalis' home and dropped them off down the road. Calabrese and the defendant ran through the woods to Vitalis' home. They watched the home and saw Vitalis' mother come home. At approximately 6 p.m., Calabrese and the defendant, wearing masks, bandanas, black hats, and gloves, entered the home, encountered Vitalis' mother, and restrained her using zip ties. Calabrese, armed with a Ruger handgun that he received from Niraj, went upstairs and encountered Vitalis in his bedroom. He struck Vitalis with the handgun and shot him three times, killing him. Calabrese searched the bedroom but could find only Vitalis' wallet with $70 and approximately one-half ounce of marijuana, both of which he took. Calabrese and the defendant ran from the property into the woods, where the defendant lost his cell

State *v.* Patel

phone. Calabrese and the defendant eventually met up with Niraj, who was driving around looking for them. Calabrese burned his clothing and sneakers on the side of Wolfe Road in Warren.

"After freeing herself, Vitalis' mother called 911. State police . . . arrived at the scene at approximately 6:14 p.m. and found Vitalis deceased. Some of the drawers in the furniture in Vitalis' bedroom were pulled out. The police searched the bedroom and found $32,150 . . . 1.7 pounds of marijuana . . . and evidence of marijuana sales." (Footnote omitted.) *State* v. *Patel*, supra, 194 Conn. App. 250–51.

The record reveals the following additional undisputed facts and procedural history. While the police were investigating the Sharon home invasion, Calabrese was arrested and detained on an unrelated charge. While in custody, Calabrese recounted the events that had occurred during the home invasion, including the defendant's role, to a jailhouse informant who was surreptitiously recording the conversation. At trial, the state established that Calabrese had invoked his fifth amendment privilege not to testify and introduced, over defense counsel's objection, the recording of Calabrese's dual inculpatory statement as a statement against penal interest under § 8-6 (4) of the Connecticut Code of Evidence. The state also introduced cell phone site location information, testimony from Calabrese's former girlfriend, and other evidence that tended to corroborate the defendant's presence at, and involvement in, the Sharon home invasion, as well as evidence establishing that friends and family of the defendant had been unable to make contact with the defendant immediately before, during, and after the period during which the Sharon home invasion occurred. See id., 251–52, 262, 284–89.

The defense advanced theories of alibi and third-party culpability. The defendant's older sister, Salony Majmu-

State *v.* Patel

dar, testified that the defendant was visiting her in Boston, Massachusetts, to celebrate an important Hindu holiday when the Sharon home invasion occurred.[3] Defense counsel also sought to have Majmudar testify about a purported confession that had been made to her by Niraj's brother, Shyam Patel (Shyam), in which Shyam admitted that it was he, and not the defendant, who had accompanied Calabrese to Vitalis' home. Defense counsel offered Shyam's statement as a statement against penal interest under § 8-6 (4) of the Connecticut Code of Evidence. The trial court sustained the prosecutor's objection to the admission of the statement, ruling that the statement was insufficiently trustworthy to satisfy § 8-6 (4).

The jury returned a verdict, finding the defendant guilty of murder, home invasion, burglary in the first degree as an accessory, robbery in the first degree as an accessory, conspiracy to commit burglary in the first degree, and tampering with physical evidence, among other charges, and the trial court thereafter rendered judgment in accordance with the jury's verdict. See footnote 1 of this opinion. The court imposed a total effective sentence of forty-five years of imprisonment, execution suspended after thirty-five years and one day, and five years of probation.

The defendant appealed from the judgment of conviction, claiming that constitutional and evidentiary errors entitled him to a new trial. See id., 249–50. The Appellate Court affirmed the judgment of conviction. Id., 250,

_____

[3] The holiday, Raksha Bhandana, which celebrates the bond between a brother and sister, or other close male/female relationships, fell on August 2, 2012. The director of Hindu life at Yale University confirmed the holiday's significance and that, although the preferred way to celebrate is in each other's presence, there is flexibility in both the manner and timing of the holiday's observance. Cell phone records established that Majmudar and the defendant had a thirty-seven minute phone call on August 2, 2012, and no phone contact on August 6, 2012.

State *v.* Patel

301. We thereafter granted the defendant's petition for certification to appeal, limited to the following issues: (1) whether the Appellate Court correctly concluded that the admission of Calabrese's dual inculpatory statement (a) did not violate the defendant's confrontation rights under the United States constitution, (b) did not violate the defendant's confrontation rights under the Connecticut constitution, and (c) was proper under our code of evidence as a statement against penal interest; and (2) whether the Appellate Court correctly concluded that the trial court had properly excluded Shyam's confession. See *State* v. *Patel*, supra, 334 Conn. 921 n.22. The defendant's constitutional claims are subject to plenary review; see, e.g., *State* v. *Smith*, 289 Conn. 598, 618–19, 960 A.2d 993 (2008); whereas his evidentiary claims, which challenge the application, rather than the interpretation, of our code of evidence, are reviewed for an abuse of discretion. See, e.g., *State* v. *Pierre*, 277 Conn. 42, 68, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006); see also *State* v. *Saucier*, 283 Conn. 207, 218–21, 926 A.2d 633 (2007) (contrasting standards of review).

I

The defendant challenges the admission of Calabrese's dual inculpatory statement on both constitutional and evidentiary grounds. We agree with the Appellate Court that the trial court properly admitted this statement.

The following additional undisputed facts provide context for our resolution of this issue. Calabrese was arrested on August 29, 2013, on drug charges unrelated to the August 6, 2012 Sharon home invasion. He was initially held in custody at the same correctional facility where Wayne Early was being held following his convictions of attempted burglary in the first degree with a deadly weapon and criminal possession of a firearm.

State *v.* Patel

On September 3, 2013, Early was summoned to the facility's intelligence office. Department of Correction officials there informed Early that Calabrese, whom Early did not know, was going to be moved into Early's cell and asked Early whether he would be willing to wear a recording device. Early previously had made confidential recordings of other cellmates. Early said that he would be willing to record Calabrese, if Calabrese seemed inclined to talk. Late that evening, Calabrese was moved into Early's cell. The two men shared information about the charges for which they were in custody. Early disclosed that he had originally been charged with home invasion, but that charge later was reduced to burglary. Calabrese responded that the police were "looking" at him for the same type of incident and began to talk about the Sharon home invasion.[4] Early changed the subject because he was not yet wearing the recording device.

The following day, Early was brought back to the corrections intelligence office. Early confirmed that he was willing to record Calabrese. A corrections official then placed a call to a state police official, who spoke with Early to establish that he had no knowledge about the incident of interest[5] and directed Early to get details about it if he could. When Early returned to his cell, equipped with a hidden recording device, he gradually turned the conversation to the subject of the home invasion that Calabrese had mentioned the prior night, telling Calabrese that he "want[ed] to hear how that shit went down . . . ." Calabrese volunteered many

_____

[4] In the recorded exchange on September 4, 2013, Calabrese told Early that the police had questioned him about the incident after they reviewed cell phone records for Vitalis, which eventually led them to information about Calabrese's cell phone. The trial court credited Early's testimony that, on the evening of September 3, 2013, Calabrese initiated the topic of the Sharon home invasion.

[5] It is unclear from the record whether Early was told where the incident took place, or how the matter of interest was described to Early.

State *v.* Patel

details, including the fact that the defendant participated, but Early repeatedly asked questions to obtain further details or clarification about the incident.

Calabrese's account ascribed the following actions and intentions to the participants. He and the defendant went to Sharon with the intention of robbing a drug dealer (Vitalis). Calabrese entered Vitalis' home first, because he was the only one with a gun. After they entered and saw Vitalis' mother, Calabrese grabbed her and started to tie her hands. Calabrese directed the defendant to finish the task and to watch her while Calabrese confronted Vitalis upstairs. Calabrese did not plan to shoot Vitalis but did so after Vitalis threatened him with a knife and tried to grab the gun. The defendant fled when he heard the gunshots, allowing Vitalis' mother to make her way to a phone and to call the police. Calabrese's search yielded only $70 and a small amount of marijuana before he had to flee. Calabrese was able to catch up with the defendant because the defendant had stopped to look for his cell phone, which he had dropped while running through a swampy area in the woods and was unable to recover. Niraj, who had planned the robbery, eventually found them and gave Calabrese a change of clothes. Calabrese set fire to his blood soaked clothes and shoes in a wooded area, because he had left a footprint in a pool of Vitalis' blood at the crime scene.

At trial, the state offered the recording of Calabrese's dual inculpatory statement into evidence for its truth; therefore, it indisputably is hearsay. See Conn. Code Evid. § 8-1 (3). Because Calabrese's invocation of his fifth amendment privilege not to testify deprived the defendant of an opportunity to cross-examine Calabrese about that statement, his statement is admissible only if it avoids the constitutional hurdle imposed by the confrontation clauses of the federal and state constitutions; see U.S. Const., amends. VI and XIV, §1; Conn.

State *v.* Patel

Const., art. I, § 8; and the evidentiary hurdle of hearsay rules.[6]

A

The parties disagree as to whether the United States Supreme Court has in fact settled the issue of whether the admission of a hearsay statement to a jailhouse informant inculpating the declarant and a codefendant violates the codefendant's rights under the confrontation clause of the sixth amendment to the United States constitution. The defendant contends that the court answered that question in the negative only in dicta, under distinguishing circumstances, and that subsequent decisions that have expanded the framework of this inquiry by recognizing that the identity and actions of the questioner must be considered. The defendant argues that he prevails under the current framework because Early, acting as an agent of law enforcement, effectively interrogated Calabrese for the primary purpose of obtaining testimony to be used in a criminal prosecution.

There can be no doubt that the court's confrontation clause jurisprudence has vexed courts as applied to

_____

[6] Although several of this court's decisions address the evidentiary issue first; see, e.g., *State* v. *Simpson*, 286 Conn. 634, 650–51, 945 A.2d 449 (2008); *State* v. *Camacho*, supra, 282 Conn. 362–63; *State* v. *Kirby*, 280 Conn. 361, 373–78, 908 A.2d 506 (2006); those cases appear to rely on the jurisprudential policy of constitutional avoidance, which directs courts to decide a case on a nonconstitutional basis if one is available, rather than unnecessarily deciding a constitutional issue. See, e.g., *State* v. *Cameron M.*, 307 Conn. 504, 516 n.16, 55 A.3d 272 (2012) (overruled in part on other grounds by *State* v. *Elson*, 311 Conn. 726, 728 n.14, 754, 91 A.3d 862 (2014)), cert. denied, 569 U.S. 1005, 133 S. Ct. 2744, 186 L. Ed. 2d 194 (2013); *State* v. *McCahill*, 261 Conn. 492, 501, 811 A.2d 667 (2002). This policy is inapplicable, however, to cases in which a defendant raises the constitutional claim based on his right to confrontation. Resolution of the evidentiary claim would not obviate the need to address the constitutional issue because, even if the statement is inadmissible under the hearsay exception relied on, the state would be free on retrial to seek admission of the same statement on a different evidentiary basis. The constitutional issue, therefore, is the appropriate starting point.

State *v.* Patel

particular circumstances, a point we elaborate on in part I B of this opinion. The present case, however, is one in which we have confidence as to how the court would resolve the issue presented, namely, in favor of the state. The federal constitutional issue, therefore, is our starting point. See *State* v. *Purcell*, 331 Conn. 318, 334 n.11, 203 A.3d 542 (2019) (noting that we address federal constitution first when "we can predict to a reasonable degree of certainty how the United States Supreme Court would resolve the issue"); see also *State* v. *Taupier*, 330 Conn. 149, 166 n.14, 193 A.3d 1 (2018) (concluding that it was more efficient to address federal claim first because review of federal precedent would be necessary under state constitutional framework in *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992)), cert. denied,      U.S.      , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

The sixth amendment's confrontation clause, which is binding on the states through the due process clause of the fourteenth amendment; *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const., amend. VI. Although an "essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination"; (emphasis omitted; internal quotation marks omitted) *Davis* v. *Alaska*, 415 U.S. 308, 315–16, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); this clause has never been interpreted to require the opportunity to cross-examine every hearsay declarant. See, e.g., *Idaho* v. *Wright*, 497 U.S. 805, 813–14, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); see also *Crawford* v. *Washington,* 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

In prior cases, we have chronicled the development of the court's confrontation case law, including its sea

State *v.* Patel

change from a focus on whether the hearsay statement bore adequate "indicia of reliability"; (internal quotation marks omitted) *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980); to a focus on whether the statement is "[t]estimonial" in nature under *Crawford* v. *Washington*, supra, 541 U.S. 59, and its progeny. See generally *State* v. *Rodriguez*, 337 Conn. 175, 226–27, 252 A.3d 811 (2020) (*Kahn, J.*, concurring).[7] Although the court has "labored to flesh out what it means for a statement to be 'testimonial' "; *Ohio* v. *Clark*, 576 U.S. 237, 244, 135 S. Ct. 2173, 192 L. Ed. 2d 306 (2015); it has deemed the term to include not only ex parte in-court testimony and formalized testimonial materials such as affidavits and depositions but also "[p]olice interrogations . . . ." *Crawford* v. *Washington*, supra, 51–53. The court used that term in its colloquial, rather than its strictly legal, sense to include a "recorded statement, knowingly given in response to structured police questioning . . . ." Id., 53 n.4. Such statements "are testimonial when the circumstances objectively indicate that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (Internal quotation marks omitted.) *Ohio* v. *Clark*, supra, 244, quoting *Davis* v. *Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

In dicta in *Crawford* and *Davis*, the court indicated that statements of a coconspirator to a fellow inmate and to an undercover agent inculpating the defendant were clearly nontestimonial. The court asserted that its newly adopted testimonial rubric would not alter the results reached in its prior cases. See *Davis* v. *Washington*, supra, 547 U.S. 825–26; *Crawford* v. *Washington*,

---

[7] See also *State* v. *Sinclair*, 332 Conn. 204, 218–25, 210 A.3d 509 (2019); *State* v. *Slater*, 285 Conn. 162, 169–74, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008); *State* v. *Kirby*, supra, 280 Conn. 378–83.

State *v.* Patel

supra, 541 U.S. 58. Two of the cases cited by the court as examples were *Dutton* v. *Evans*, 400 U.S. 74, 77–78, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970) (plurality opinion), and *Bourjaily* v. *United States*, 483 U.S. 171, 174, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987), in which the declarants were unavailable for cross-examination. See *Davis* v. *Washington*, supra, 825; *Crawford* v. *Washington*, supra, 57–58. In *Dutton*, the court had held that the admission of a statement of the defendant's coconspirator to a cellmate, implicating the defendant in a triple homicide, did not violate the defendant's confrontation rights. See *Dutton* v. Evans, supra, 87–89. In *Bourjaily*, the court had held that the admission of a recorded telephone conversation between the defendant's coconspirator and an FBI informant, in which the coconspirator implicated the defendant in a drug selling enterprise, did not violate the defendant's confrontation rights. See *Bourjaily* v. *United States*, supra, 173–74, 183–84.

Post-*Crawford*, federal courts and state courts have consistently rejected claims that the admission of inmate to inmate or inmate to informant statements inculpating a defendant, whether recorded or not, violated his or her confrontation rights. See, e.g., *United States* v. *Veloz*, 948 F.3d 418, 430–32 (1st Cir.), cert. denied,      U.S.     , 141 S. Ct. 438, 208 L. Ed. 2d 133 (2020); *United States* v. *Dargan*, 738 F.3d 643, 650–51 (4th Cir. 2013); *United States* v. *Dale*, 614 F.3d 942, 954–56 (8th Cir. 2010), cert. denied, 563 U.S. 918, 131 S. Ct. 1814, 179 L. Ed. 2d 774 (2011), and cert. denied sub nom. *Johnson* v. *United States*, 563 U.S. 919, 131 S. Ct. 1814, 179 L. Ed. 2d 775 (2011); *United States* v. *Smalls*, 605 F.3d 765, 778 (10th Cir. 2010); *People* v. *Arauz*, 210 Cal. App. 4th 1394, 1402, 149 Cal. Rptr. 3d 211 (2012); *State* v. *Nieves*, 376 Wis. 2d 300, 326–27, 897 N.W.2d 363 (2017). Courts also have routinely held that statements made unwittingly to a government agent or an undercover officer, outside of the prison context, are nontestimo-

State *v.* Patel

nial.[8] See, e.g., *Brown* v. *Epps*, 686 F.3d 281, 287 and n.35 (5th Cir. 2012) (citing cases reaching this conclusion). Although some of these cases simply relied on the United States Supreme Court's dicta; see, e.g., *United States* v. *Veloz*, supra, 431–32; *United States* v. *Saget*,

---

[8] We are aware of only two cases to the contrary. In *Cazares* v. *State*, Docket No. 08-15-00266-CR, 2017 WL 3498483, *10 (Tex. App. August 16, 2017, review refused), cert. denied, U.S. , 139 S. Ct. 422, 202 L. Ed. 2d 324 (2018), the court deemed the informant's purpose, which was unknown to the declarant, to be dispositive. In *People* v. *Redeaux*, 355 Ill. App. 3d 302, 823 N.E.2d 268, cert. denied, 215 Ill. 2d 613, 833 N.E.2d 7 (2005), the court took a narrower approach. It suggested that a coconspirator's statements to an undercover officer could be testimonial if elicited pursuant to an "interrogation," meaning formal, structured questioning. (Internal quotation marks omitted.) Id., 306–307. The court in *Redeaux* ultimately concluded that the conversation at issue did not come close to such questioning, pointing to the facts that its purpose was to facilitate a drug transaction, not "a subterfuge to gain information about this or some other crime," and that the undercover officer never asked the coconspirator, a drug dealer, to name his "source," i.e., the defendant. (Internal quotation marks omitted.) Id., 306.

Before and shortly after *Crawford* was decided, a few commentators had advocated for a de facto interrogation approach but limited that term to circumstances in which there was sustained questioning, leading questions, or suggestions made with a preconceived notion of the evidence that the agent or informant wanted to obtain. See M. Berger, "The Deconstitutionalization of the Confrontation Clause: A Proposal for a Prosecutorial Restraint Model," 76 Minn. L. Rev. 557, 608–609 (1992); M. Seigel & D. Weisman, "The Admissibility of Co-Conspirator Statements in a Post-*Crawford* World," 34 Fla. St. U. L. Rev. 877, 903–904 (2007). Courts have rejected a "de facto" interrogation theory in the context of jailhouse informants acting as agents for the police on the grounds that this circumstance is not an interrogation and would not yield a testimonial statement, even if it could be broadly characterized as an interrogation. See, e.g., *United States* v. *Smalls*, supra, 605 F.3d 779 ("[C]asual questioning by a fellow inmate does not equate to police interrogation, even though the government coordinated the placement of the fellow inmate and encouraged him to question [the defendant's accomplice]. But whether we properly may label [the confidential informant's] encounter with [the defendant's accomplice] as an interrogation in some remote sense is beside the point because *Davis* establishes that not every statement made in response to an interrogation is testimonial. Rather, only in some instances does interrogation tend to generate testimonial responses." (Emphasis omitted; internal quotation marks omitted.)). But see id., 788 (Kelly, J., dissenting) (arguing that history supports confrontation analysis based on declarant with full knowledge of facts, including true identity and purpose of person eliciting information). We explain subsequently in this opinion why both *Cazares* and *Redeaux* are contrary to the United States Supreme Court's most recent case law.

State *v.* Patel

377 F.3d 223, 229 (2d Cir. 2004), cert. denied, 543 U.S. 1079, 125 S. Ct. 938, 160 L. Ed. 2d 821 (2005); many others reasoned that such statements could not have been given for the purpose of proving past facts relevant to a prosecution because the declarant did not know that he was speaking to an informant or an undercover officer. See, e.g., *United States* v. *Dargan*, supra, 646, 650–51; *State* v. *Nieves*, supra, 326–27.

The defendant contends, however, that the court's more recent confrontation clause jurisprudence suggests that the court would now reject this dicta. Our review of this case law confirms, rather than undermines, the vitality of this dicta.

"*Crawford* and *Davis* did not address whose perspective matters—the declarant's, the interrogator's, or both—when assessing the primary purpose of [an] interrogation." (Internal quotation marks omitted.) *Michigan* v. *Bryant*, 562 U.S. 344, 381, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011) (Scalia, J., dissenting). More recent cases have interpreted *Davis* to require consideration of "the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs." Id., 370; see also *Ohio* v. *Clark*, supra, 576 U.S. 246–47 (considering identity of participants as well). A consistent theme echoed in the case law, however, is that this consideration is one based on *objective* facts. See *Davis* v. *Washington*, supra, 547 U.S. 826 ("[t]he question before us in *Davis* . . . is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements"); *Crawford* v. *Washington*, supra, 541 U.S. 52 (testimonial statements would include those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" (internal quotation marks omitted)).

State *v.* Patel

This point was underscored and elaborated on in *Michigan* v. *Bryant*, supra, 562 U.S. 344, when the court stated: "The Michigan Supreme Court correctly understood that this inquiry is objective. . . . *Davis* uses the word 'objective' or 'objectively' no fewer than eight times in describing the relevant inquiry. . . . 'Objectively' also appears in the definitions of both testimonial and nontestimonial statements that *Davis* established. . . .

"An objective analysis of the circumstances of an encounter and the statements and actions of the parties to it provides the most accurate assessment of the 'primary purpose of the interrogation.' The circumstances in which an encounter occurs—e.g., at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards—are clearly matters of objective fact. The statements and actions of the parties must also be objectively evaluated. That is, *the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.*" (Citations omitted; emphasis added; footnote omitted.) Id., 360.

The court's most recent confrontation clause case exemplifies this objective, totality of circumstances approach, as well as the significance of the formality of the encounter in making that determination. See *Ohio* v. *Clark*, supra, 576 U.S. 237. In *Clark*, the court considered the statements of a three year old child, in response to his teachers' questions, in which he identified his mother's boyfriend as the perpetrator of injuries discovered by the teachers. Id., 240. The teachers were mandated by state law to report suspected abuse to government authorities. Id., 242. These facts required the court to squarely address for the first time the question of whether statements made to individuals who are

State *v.* Patel

not law enforcement officers implicate confrontation rights.Id., 246.

The court first summarized its confrontation clause jurisprudence, noting that the primary purpose test has evolved to require consideration of "all of the relevant circumstances." (Internal quotation marks omitted.) Id., 244. One such circumstance it identified "is the informality of the situation and the interrogation. . . . A formal [station house] interrogation, like the questioning in *Crawford*, is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." (Citation omitted; internal quotation marks omitted.) Id., 245.

The court in *Clark* recognized that statements to individuals who are not law enforcement officers "could conceivably raise confrontation concerns"; id., 246; but cautioned that "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." Id., 249. Thus, the fact that the child was speaking to his teachers "remains highly relevant. Courts must evaluate challenged statements in context, and part of that context is the questioner's identity." Id., 249; see also id. ("the relationship between a student and his teacher is very different from that between a citizen and the police").

In concluding that the primary purpose of the encounter was not to gather evidence for the defendant's prosecution but to protect the child, the court in *Clark* pointed to the following facts: "At no point did the teachers inform [the child] that his answers would be used to arrest or punish his abuser. [The child] never hinted that he intended his statements to be used by the police or prosecutors.[9] And the conversation between

---

[9] The court in *Clark* also observed that its decision was bolstered by the age of the child: "Statements by very young children will rarely, if ever,

State *v.* Patel

[the child] and his teachers was informal and spontaneous. The teachers asked [the child] about his injuries immediately upon discovering them, in the informal setting of a preschool lunchroom and classroom, and they did so precisely as any concerned citizen would talk to a child who might be the victim of abuse. This was nothing like the formalized [station house] questioning in *Crawford* or the police interrogation and battery affidavit in *Hammon* [v. *Indiana*, which was decided together with *Davis* v. *Washington*, supra, 547 U.S. 813].''[10] (Footnote added.) Id., 247.

Consistent with *Bryant*, the court in *Clark* thus relied exclusively on the objectively *manifested* facts—what was said, who said it, how it was said, and where it was said. Nothing indicates that, contrary to *Bryant*, the hidden intentions or identity of the person eliciting the statement would be relevant, let alone dispositive.[11] See *United States* v. *Volpendesto*, 746 F.3d 273, 289–90 (7th Cir.) (''*Bryant* mandates that we not evaluate the purpose of [the] recorded conversation from the subjective point of view of [the coconspirator], who knew he was secretly collecting evidence for the government.

implicate the [c]onfrontation [c]lause. Few preschool students understand the details of our criminal justice system. Rather, [r]esearch on children's understanding of the legal system finds that young children have little understanding of prosecution. . . . Thus, *it is extremely unlikely that a* [*three year old*] *child in* [*this child's*] *position would intend his statements to be a substitute for trial testimony*.'' (Citation omitted; emphasis added; internal quotation marks omitted.) *Ohio* v. *Clark*, supra, 576 U.S. 247–48.

[10] *Hammon* involved statements given by a domestic violence victim to the police, after being isolated from her abusive husband, which were memorialized in a ''battery affidavit.'' (Internal quotation marks omitted.) *Davis* v. *Washington*, supra, 574 U.S. 820. The court held that the statements in *Hammon* were testimonial. Id., 830.

[11] The court in *Clark* rejected the defendant's reliance on the state's mandatory reporting obligation as a basis to equate the child's teachers with the police and their questions with an official interrogation. See *Ohio* v. *Clark*, supra, 576 U.S. 249. The court observed that ''mandatory reporting statutes alone cannot convert a conversation between a concerned teacher and her student into a law enforcement mission aimed primarily at gathering evidence for a prosecution.'' Id.

State *v.* Patel

Instead, we evaluate their conversation objectively. And from an objective perspective, [the recorded] conversation looks like a casual, confidential discussion between [coconspirators].''), cert. denied sub nom. *Sarno* v. *United States*, 574 U.S. 936, 135 S. Ct. 382, 190 L. Ed. 2d 256 (2014), and cert. denied sub nom. *Polchan* v. *United States*, 574 U.S. 936, 135 S. Ct. 383, 190 L. Ed. 2d 256 (2014). *Clark* also underscores the significance of the formality surrounding the questioning, which imparts to the declarant a solemnity of purpose akin to other forms of testimonial statements, such as ex parte testimony, affidavits, and grand jury testimony. See *Ohio* v. *Clark*, supra, 576 U.S. 243 (''[i]n *Crawford* . . . [w]e explained that 'witnesses,' under the [c]onfrontation [c]lause, are those 'who bear testimony,' and we defined 'testimony' as 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact' '' (citation omitted)); see also *State* v. *Sinclair*, 332 Conn. 204, 225, 210 A.3d 509 (2019) (''there is agreement among all of the justices that the formality attendant to the making of the statement must be considered'').

The court's reasoning in *Bryant* and *Clark* thus confirms the court's dicta characterizing the statements in *Dutton* and *Bourjaily* made to persons who harbored secret intentions to obtain evidence to be used at trial as clearly nontestimonial.[12] Like the statements in *Dut-*

---

[12] The defendant makes much of the fact that the statements in *Dutton* and *Bourjaily* were admitted under the hearsay exception for statements by a coconspirator—historically viewed as inherently reliable—whereas Calabrese's statement was admitted under the exception for statements against penal interest—historically viewed as presumptively unreliable when used to inculpate a codefendant. Even if we were to accept the defendant's characterization; see *United States* v. *Inadi*, 475 U.S. 387, 400, 106 S. Ct. 1121, 89 L. Ed. 2d 390 (1986) (recognizing that *Dutton* involved state coconspirator rule that admitted broader category of statements than did federal coconspirator rule); the distinction he draws is immaterial. *Bryant* would compel us to reach the same result even in the absence of this dictum. Moreover, the distinction between the hearsay exceptions has no relevance under *Crawford*'s testimonial analytical framework, which abandoned the traditional evidentiary analytical approach, a reliability focused inquiry. See,

State *v.* Patel

*ton* and *Bourjaily*, Calabrese's statement was elicited in circumstances under which the objectively manifested purpose of the encounter was not to secure testimony for trial. Calabrese made his statements in an informal setting, his prison cell, to his cellmate, who undoubtedly actively questioned the defendant but did so in an evidently sufficiently casual manner to avoid alerting Calabrese that his statement was going to be relayed to law enforcement. Cf. *United States* v. *Dargan*, supra, 738 F.3d 650–51 (statements by defendant's coconspirator to cellmate were clearly nontestimonial because they were made "in an informal setting—a scenario far afield from the type of declarations that represented the focus of *Crawford*'s concern" and declarant "had no plausible expectation of 'bearing witness' against anyone"). The admission of Calabrese's dual inculpatory statement, therefore, did not violate the defendant's confrontation rights under the federal constitution.

B

We next turn to the defendant's confrontation clause challenge under article first, § 8, of the Connecticut constitution. The defendant asks this court to hold that, under our state constitution, a statement qualifies as "testimonial" if the reasonable expectation of either the declarant *or the interrogator/listener* is to establish or to prove past events potentially relevant to a later criminal prosecution. (Internal quotation marks omitted.) We are not persuaded that the defendant has established the necessary predicates for departing from the federal standard. We do not, however, foreclose the possibility of departing from the federal standard under appropriate circumstances in a future case, and raise a strong cautionary note about the present circumstances.

e.g., *State* v. *Rivera*, 268 Conn. 351, 365 n.13, 844 A.2d 191 (2004) ("[b]ecause the United States Supreme Court [in *Crawford*] has characterized [the] statement [in *Dutton*] as nontestimonial . . . it would follow that the statement [against penal interest to a fellow inmate] . . . is also nontestimonial").

State *v.* Patel

In *State* v. *Geisler*, supra, 222 Conn. 684–85, this court identified factors to be considered to encourage a principled development of our state constitutional jurisprudence. Those six factors are (1) persuasive relevant federal precedents, (2) the text of the operative constitutional provisions, (3) historical insights into the intent of our constitutional forebears, (4) related Connecticut precedents, (5) persuasive precedents of other state courts, and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. Id., 685; accord *Feehan* v. *Marcone*, 331 Conn. 436, 449, 204 A.3d 666, cert. denied, U.S. , 140 S. Ct. 144, 205 L. Ed. 2d 35 (2019).

The defendant concedes that the first, second, and fifth factors do not support a more protective interpretation under state law. The text of the two clauses are nearly identical. Compare Conn. Const., art. I, § 8 (guaranteeing defendant's right ''to be confronted *by* the witnesses against him'' (emphasis added)) with U.S. Const., amend. VI (guaranteeing right ''to be confronted *with* the witnesses against him'' (emphasis added)). The federal and state precedent we have addressed in part I A of this opinion does not support the defendant's proposed standard. To this we would add that we are aware of only one state that has charted an independent course under its state constitution's confrontation clause with regard to this issue.[13] That state did not

_____

[13] There are examples of courts relying on their respective state constitutions to fill gaps in the United States Supreme Court's testimonial framework, at least until the court does so itself. See, e.g., *State* v. *Scanlan*, 193 Wn. 2d 753, 766, 445 P.3d 960 (2019) (concluding that Washington case law articulating comprehensive definition of ''testimonial'' statements and specific test for applying that definition to statements to nongovernmental witnesses under Washington constitution due to gap in federal jurisprudence was superseded by subsequent decision of United States Supreme Court applying its primary purpose test to statements to nongovernmental witnesses), cert. denied, U.S. , 140 S. Ct. 834, 205 L. Ed. 2d 483 (2020); see also *State* v. *Rodriguez*, supra, 337 Conn. 226–27 (*Kahn, J.*, concurring) (filling gap regarding admissibility of forensic evidence with its own test

State *v.* Patel

adopt the defendant's proposed standard; it never adopted *Crawford*'s testimonial standard and continued to adhere to the "adequate indicia of reliability" standard recognized in *Ohio* v. *Roberts*, supra, 448 U.S. 66. See *State* v. *Copeland*, 353 Or. 816, 820–24, 306 P.3d 610 (2013).

With regard to the third and fourth factors, historical insights and Connecticut precedent, the defendant expressly conceded before the Appellate Court that these factors also do not favor his position. This court's first confrontation clause case, in 1921, took the position that "[t]he underlying reasons for the adoption of this right in the [f]ederal [c]onstitution and in [s]tate [c]onstitutions, and the principles of interpretation applying to this provision, are identical." *State* v. *Gaetano*, 96 Conn. 306, 310, 114 A. 82 (1921). We recently reiterated this position. See *State* v. *Lockhart*, 298 Conn. 537, 555, 4 A.3d 1176 (2010) (noting that federal and state provisions are subject to same interpretation because they have "shared genesis in the common law").[14]

The defendant does not expressly concede the third and fourth *Geisler* factors to this court as he did before

under federal constitution); *People* v. *John*, 27 N.Y.3d 294, 312–15, 52 N.E.3d 1114, 33 N.Y.S.3d 88 (2016) (filling gap regarding admissibility of forensic scientific laboratory reports).

[14] Although this court indicated that the federal and state provisions are subject to the same interpretation because of their "shared genesis in the common law"; *State* v. *Lockhart*, supra, 298 Conn. 555; it is important to acknowledge that we have never undertaken an independent examination of the circumstances surrounding the adoption of the federal confrontation clause. This acknowledgement is important because examinations of those circumstances by courts and scholars have not yielded a consensus as to what historical facts matter and what these facts reveal about the intended meaning and application of the confrontation clause.

This inconsistency is reflected in the court's case law; see, e.g., *Crawford* v. *Washington*, supra, 541 U.S. 60–64 (determining that court's previous interpretation of confrontation clause in *Roberts* was wholly incompatible with historical basis for adoption of confrontation clause); as well as in scholarship that, in turn, criticizes *Crawford*'s own historical account. See, e.g., K. Graham, "Confrontation Stories: Raleigh on the Mayflower," 3 Ohio St. J. Crim. L. 209, 209 (2005) ("Justice Scalia's majority opinion [in *Crawford*]

State *v.* Patel

tells a version of the history of the [c]onfrontation [c]lause that would do Hollywood proud"); B. Trachtenberg, "Confronting Coventurers: Coconspirator Hearsay, Sir Walter Raleigh, and the Sixth Amendment Confrontation Clause," 64 Fla. L. Rev. 1669, 1677–78 (2012) (citing sources).

The lack of consensus as to which historical facts motivated the adoption of the confrontation clause and how the clause applies to present circumstances seems to be a product of several factors. No court or scholar has concluded that the confrontation clause is unambiguous and can be interpreted literally. See *State* v. *Torello*, 103 Conn. 511, 513, 131 A. 429 (1925) ("[interpreted] [l]iterally it would prohibit the introduction of the testimony of any witness who was not produced in court"); M. Larkin, "The Right of Confrontation: What Next?," 1 Tex. Tech L. Rev. 67, 67 (1969) ("[t]he precise source of this use of the word 'confront' is obscure"). Ascertaining original intent in the absence of a plain textual meaning is complicated by the lack of any meaningful debate during the drafting and ratification of the federal confrontation clause. See H. Gutman, "Academic Determinism: The Division of the Bill of Rights," 54 S. Cal. L. Rev. 295, 332 n.181 (1981) (debate on confrontation clause lasted five minutes); R. Mosteller, "Remaking Confrontation Clause and Hearsay Doctrine Under the Challenge of Child Sexual Abuse Prosecutions", 1993 U. Ill. L. Rev. 691, 737 ("Enough of the historical materials surrounding the drafting and the ratification debates survives that we can be relatively confident that no precise meaning was ascribed to the [c]onfrontation [c]lause in either process. Indeed, the clause received only limited attention." (Footnote omitted.)). Case law is of marginal help in ascertaining original intent because criminal cases largely were tried in state courts at the time of the framing and the sixth amendment right of confrontation was not extended to the states until 1965. See R. Friedman, "*Crawford*, *Davis* and *Way* Beyond," 15 J.L. & Policy 553, 553 (2007); K. Graham, supra, 3 Ohio St. J. Crim. L. 210.

In addition, application of the confrontation clause has been complicated by significant historical developments that could not have been foreseen by the framers. Crimes are investigated and prosecuted differently than at the time of the framing. See M. Mannheimer, "Toward a Unified Theory of Testimonial Evidence Under the Fifth and Sixth Amendments," 80 Temp. L. Rev. 1135, 1164 (2007) ("professional police now replicate the investigatory function of the magistrate"); E. Schaerer, "Proving the Constitution: Burdens of Proof and the Confrontation Clause," 55 U. Rich. L. Rev. 491, 494–95 (2021) (noting that, at time of framing, police generally did not initiate investigations on their own based on suspicion of probable crime, and prosecution typically was initiated by crime victims and their families); M. Seigel & D. Weisman, "The Admissibility of Co-Conspirator Statements in a Post-*Crawford* World," 34 Fla. St. U. L. Rev. 877, 906–907 (2007) ("[i]n the [f]ramers' day, there was essentially no such thing as an undercover investigation; indeed, organized, professional police forces did not come onto the scene until around the Civil War" (footnote omitted)). Hearsay exceptions have been expanded significantly; see E. Schaerer, supra, 494–95; and new forms of evidence, e.g., forensic evidence, have developed. See D. Noll, "Constitutional Evasion and the Confrontation Puzzle," 56 B.C. L. Rev. 1899, 1904 (2015).

State *v.* Patel

the Appellate Court, but he acknowledges this case law
in his brief to this court. In lieu of an argument regarding
the significance of that case law, the defendant empha-
sizes the historical fact that third-party statements
against penal interest constituted inadmissible hearsay
at the time of the framing, as well as for an extended
period thereafter. See, e.g., *Bruton* v. *United States*,
391 U.S. 123, 128 n.3, 88 S. Ct. 1620, 20 L. Ed. 2d 476
(1968); *State* v. *Schiappa*, 248 Conn. 132, 147 and n.18,
728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152,
145 L. Ed. 2d 129 (1999). See generally E. Schaerer,
"Proving the Constitution: Burdens of Proof and the
Confrontation Clause," 55 U. Rich. L. Rev. 491, 494
(2021) ("[a]t the framing, hearsay was more strictly
prohibited at trial, and courts recognized few hearsay
exceptions"). This fact has no logical connection, how-
ever, to the defendant's proposed confrontation stan-
dard.[15] The defendant's testimonial standard would not

The defendant advances no argument about the significance of any of
these factors, other than the lack of a historical hearsay exception for
statements against penal interest, which we address subsequently in this
opinion. We acknowledge these factors to make clear that *Gaetano* does
not foreclose an argument that the federal courts have misinterpreted the
confrontation clause or that the development of our common law may
support an independent interpretation in a different context.

[15] In the section of his brief devoted to historical insights and Connecticut
precedent, the defendant cites authority for propositions that he also does
not connect to the principal question before us—whether our state has ever
been more protective of confrontation rights than the federal system or
standard—and that do not lend support to the specific testimonial standard
that he advances. These authorities state the following propositions: Con-
necticut has long recognized the importance of cross-examination; see, e.g., 2
H. Dutton, A Revision of Swift's Digest of the Laws of the State of Connecticut
(1862) c. XX, § 411, p. 437; and special sensitivity to confrontation clause
concerns is appropriate when the testimony of a witness is critical to the
state's case against the defendant and the consequences of a conviction
based on the absent witness' testimony are grave. See, e.g., *State* v. *Lebrick*,
334 Conn. 492, 507, 512, 223 A.3d 333 (2020) (stating these principles in
connection with question of whether state made reasonable efforts to locate
witness who purportedly was unavailable to testify, to satisfy federal con-
frontation clause).

The defendant also cites to one scholarly article in which the author
asserts that the testimonial nature of the statement should be established

State *v.* Patel

categorically preclude such statements, whether they were dual inculpatory statements or not; it would only preclude such statements when the declarant is unavailable for cross-examination and the reasonable expectation of either the declarant or the listener is to establish or to prove past events potentially relevant to a later criminal prosecution. Reliance on the lack of a recognized exception for these statements at the time of the framing is also in tension with the defendant's representation that he does not seek to overrule *Crawford,* which rejected the *Roberts* framework, which considered whether the statement fell within a "firmly rooted" hearsay exception. See *Ohio* v. *Roberts,* supra, 448 U.S. 66; see also *State* v. *Nieves,* supra, 376 Wis. 2d 316–19 (citing sources addressing admission of dual inculpatory statements post-*Crawford* and acknowledging that *Bruton*[16] doctrine regarding confrontation violation arising from admission of such statements as against third party survives only as to testimonial statements).

The defendant's state constitutional claim, thus, effectively rests exclusively on the sixth *Geisler* factor, public policy. He identifies the following considerations. First, the defendant argues that the United States Supreme Court is not infallible. The sea change from *Roberts*' reliability standard to *Crawford*'s testimonial standard demonstrates this reality, as does the fact that the court's confrontation clause case law continues to be in flux. Second, the defendant seeks a modified interpretive standard—an additional layer of prophylaxis to

_____

from the perspective of either the speaker or the listener. See M. Pardo, "Confrontation After Scalia and Kennedy," 70 Ala. L. Rev. 757, 782 (2019). The author of this article offers no historical analysis to support this standard and acknowledges doctrinal difficulties in applying it. See id., 782 n.180. Many other commentators reject the defendant's view. See, e.g., M. Mannheimer, supra, 80 Temp. L. Rev. 1192; W. Reed, "*Michigan* v. *Bryant*: Originalism Confronts Pragmatism," 89 Denv. L. Rev. 269, 300–302 (2011).

[16] *Bruton* v. *United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

State *v.* Patel

prevent a significant risk of deprivation of confrontation rights—not the rejection of the court's testimonial, primary purpose framework. The defendant argues that this interpretation fills a gap in the court's case law, which has yet to clarify if a statement is testimonial when the speaker is unaware that the statement may be used as evidence in a criminal prosecution but the listener seeks to obtain the statement for that purpose. He contends that, by adopting a standard under which the perspective of either the declarant or the listener can render the statement testimonial, we would place the emphasis where it belongs—on the testimonial *effect* of the statement, i.e., the jury would believe that the statement is equivalent to testimony and would rely on it to assess guilt or innocence. Third, the defendant argues that the adoption of the "either perspective" approach would serve the public interest by enhancing the perception that our criminal trial proceedings are fair.[17] (Internal quotation marks omitted.)

[17] The defendant's brief has a fourth policy section, from which we have difficulty gleaning a specific policy argument. The defendant asserts that one or more of the participants in the planning and execution of Calabrese's "interrogation" should have known that the recorded statement would be admissible at trial if Calabrese was unavailable to testify, that the sequence of codefendants' trials can affect their availability for cross-examination, and that sequence is a matter of prosecutorial discretion.

There are several flaws in these assumptions. There is no evidence that the police knew that Calabrese was the shooter when they asked Early to record him. Had Calabrese offered an account identifying someone else as the shooter, it is possible that the state would have attempted to use the statement to extract a plea agreement in exchange for Calabrese's testimony against the shooter. Even if Calabrese had been tried first after admitting to being the shooter, there is a strong possibility that he still would have been unavailable to testify at the defendant's subsequent trial. Calabrese's fifth amendment privilege would continue during any pending appeal; see, e.g., *United States* v. *Kennedy*, 372 F.3d 686, 691 (4th Cir. 2004), cert. denied, 543 U.S. 1123, 125 S. Ct. 1019, 160 L. Ed. 2d 1073 (2005); as well as during any possible retrial should he prevail on appeal. We also note that circumstances outside of the state's control (e.g., discovery, availability of witnesses, etc.) may dictate the sequence of codefendants' trials. If a rare case arose in which there was evidence that the state intentionally delayed the declarant's trial so as to ensure the declarant's unavailability for cross-examination,

State *v.* Patel

We are not persuaded that these arguments are sufficient to carry the day under the present circumstances. We previously have relied on policy considerations similar to those mentioned by the defendant but have always cited to other *Geisler* factors that supported the rule we adopted. See, e.g., *State* v. *Purcell*, supra, 331 Conn. 342–46 (explaining that we were adopting broader prophylactic rule not expanding constitutional right, but also citing other *Geisler* factors that supported rule); *State* v. *Linares*, 232 Conn. 345, 379–80, 655 A.2d 737 (1995) (concluding that United States Supreme Court's rationale for departing from prior, more protective standard was unsound but also citing other *Geisler* factors that supported our rule). Although the need to fill a "gap" in the court's confrontation jurisprudence to resolve a case may provide a compelling policy argument, even in the absence of other supporting *Geisler* factors, our discussion in part II explains why the gap identified by the defendant does not exist. None of the defendant's other policy arguments rises to a similar level of necessity. Some of his policy arguments, e.g., that the court does not always reach the correct result, could apply in any case. In sum, it is clear that the defendant cannot prevail under a traditional *Geisler* analysis. His state constitutional claim under the confrontation clause, therefore, fails.[18]

the defendant may have a viable due process claim or argument for the adoption of an equitable rule akin to the forfeiture doctrine, which bars a defendant from objecting to the admission of hearsay statements of a witness whose absence has been procured by the defendant. See T. Lininger, "Reconceptualizing Confrontation After *Davis*," 85 Tex. L. Rev. 271, 300–301 and nn.165–68 (2006) (discussing forfeiture doctrine). We have no occasion to consider either possibility in the present case.

[18] We underscore that we do not intend for this decision to foreclose the possibility of departing from the federal courts' interpretation of the confrontation clause in another context. We are mindful of two concerns that are not implicated in the present case that may, in the future, weigh in favor of an independent course of action. First, there are indications in opinions of various United States Supreme Court justices that the court may adopt more limiting principles than those articulated in *Crawford* and *Davis*. See, e.g., *Williams* v. *Illinois*, 567 U.S. 50, 58–59, 132 S. Ct. 2221,

State *v.* Patel

We end this discussion, however, with a strong note of caution. Although the defendant cannot prevail under our state constitution in the present case, we might be compelled to reach a different result under a slight variation of facts. The circumstances under which Calabrese's statement was elicited implicate several concerns identified by the court in *Crawford* and its progeny. *Crawford* recognized that "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse . . . ." *Crawford* v. *Washington*, supra, 541 U.S. 56 n.7. The court in *Davis* also cautioned that law enforcement officials should not be permitted to circumvent the confrontation clause by intentionally altering the method by which they collect the statement to render the statement nontestimonial. See *Davis* v. *Washington*, supra, 547 U.S. 826 ("we do not think it conceivable that the protections of the [c]onfrontation

183 L. Ed. 2d 89 (2012) (plurality opinion); see also *Ohio* v. *Clark*, supra, 576 U.S. 254 (Thomas, J. concurring). Second, courts are increasingly confronting circumstances in which they are unsure how to assess whether a statement is testimonial. See K. McMunigal, "*Crawford*, Confrontation, and Mental States," 64 Syracuse L. Rev. 219, 220 (2014) (observing that commentators have described contemporary confrontation clause jurisprudence as " 'incoherent,' 'uncertain,' 'unpredictable,' 'a train wreck,' suffering from 'vagueness' and '[doublespeak],' and, simply put, a 'mess' " (footnotes omitted)). This problem is particularly acute in cases in which forensic evidence is at issue. See, e.g., *State* v. *Rodriguez*, supra, 337 Conn. 203–204 (*Kahn, J.*, concurring). Even some of the court's justices have complained about the lack of clear direction from the court. See id., 204 (citing cases from various courts raising this concern). Justice Gorsuch, joined by Justice Sotomayor, stated in a recent dissent from the court's denial of certiorari in a confrontation clause case: "Respectfully, I believe we owe lower courts struggling to abide our holdings more clarity than we have afforded them in this area. *Williams* imposes on courts with crowded dockets the job of trying to distill holdings on two separate and important issues from four competing opinions. The errors here may be manifest, but they are understandable and they affect courts across the country in cases that regularly recur." *Stuart* v. *Alabama*, U.S. , 139 S. Ct. 36, 37, 202 L. Ed. 2d 414 (2018) (Gorsuch, J., dissenting from the denial of certiorari). As applied to the facts of the present case, however, the current standard yields a clear result.

State *v.* Patel

[c]lause can readily be evaded by having a note-taking policeman recite the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition'' (emphasis omitted)); see also *Williams* v. *Illinois*, 567 U.S. 50, 133, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012) (Kagan, J., dissenting) (noting that five justices reject proposition that, ''[i]f the [c]onfrontation [c]lause prevents the [s]tate from getting its evidence in through the front door, then the [s]tate could sneak it in through the back''). Recruiting an inmate to elicit inculpatory evidence regarding uncharged criminal activity from another inmate suspected of committing such activity, when law enforcement officials would be unable, or were in fact unable, to obtain a confession directly,[19] clearly raises the potential for abuse.[20] Although such

[19] The police affidavit in support of the defendant's arrest warrant reflects that, many months before Calabrese gave the surreptitiously recorded statement, he had given several statements to the police about the Sharon home invasion. Calabrese was approached by the police because of cell phone records connecting him to Niraj. Calabrese provided a statement to the police at that time and later provided additional statements through his attorney. Calabrese initially claimed to have learned about the home invasion only after the fact but later admitted that he was present when Niraj announced the plan. In all of the statements, however, Calabrese disavowed any participation and claimed that the defendant and an unknown third party were the perpetrators.

[20] The fact that Early was recording Calabrese in their prison cell at the behest of law enforcement would not implicate either Calabrese's *Miranda* rights under the fifth amendment to the United States constitution; see *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); because courts do not consider this situation to be a ''custodial interrogation''; (internal quotation marks omitted) *Illinois* v. *Perkins*, 496 U.S. 292, 296–98, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990); or his right to counsel under the sixth and fourteenth amendments to the United States constitution, because that right is offense specific and is limited to charged offenses or uncharged offenses that are directly connected to the charged offense. See id., 299; *United States* v. *Basciano*, 634 Fed. Appx. 832, 836 (2d Cir. 2015), cert. denied, U.S. , 136 S. Ct. 2529, 195 L. Ed. 2d 859 (2016). But use of this tactic in other factual scenarios may cross a constitutional line. For example, if Calabrese had been charged in connection with the Sharon home invasion and invoked his right to counsel, the police could not have surreptitiously questioned him through an agent or undercover operative. See, e.g., *Massiah* v. *United States*, 377 U.S. 201, 205–206, 84 S. Ct. 1199,

State *v.* Patel

circumstances do not meet the present legal definition of an interrogation and, hence, do not implicate the confrontation clause, we can envision facts under which eliciting an inculpatory statement in this setting might rise to the level of a violation of due process or a circumstance under which it might be appropriate for this court to consider the extraordinary measure of reversal under the exercise of its supervisory authority. Cf. *Illinois* v. *Perkins*, 496 U.S. 292, 302–303, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990) (Brennan, J., concurring) (expressing concern whether due process may be violated when undercover agent and jailhouse informant "lure [the] respondent into incriminating himself when he was in jail on an unrelated charge," noting that, under such circumstances, state "can ensure that a suspect is barraged with questions from an undercover agent until the suspect confesses").

Our concerns are tempered in the present case, however, for a few reasons. There was no evidence presented suggesting any involvement by the Office of the State's Attorney in orchestrating the recording or directing the inquiry. Nor is there evidence that any police official coached Early on what questions to ask or what facts they were seeking to learn. The trial court did not abuse its discretion by crediting Early's testimony that he was not given any information about the crime and that Calabrese first raised the subject of his involvement

_____

12 L. Ed. 2d 246 (1964) ("Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with [a] crime. . . . [I]f such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse." (Citations omitted; footnotes omitted; internal quotation marks omitted.)). Although Calabrese clearly was a suspect in the Sharon home invasion when Early recorded Calabrese's statements; see footnote 19 of this opinion; there is no claim that there was probable cause to arrest Calabrese in connection with that incident at that time and that a decision was made to delay arrest to circumvent Calabrese's right to counsel.

State *v.* Patel

in the Sharon home invasion.[21] Because the exchange was recorded, the trial court was able to ascertain the extent to which, if any, Calabrese's answers may have been shaped or coerced by Early. See M. Berger, "The Deconstitutionalization of the Confrontation Clause: A Proposal for a Prosecutorial Restraint Model," 76 Minn. L. Rev. 557, 609 (1992) (noting that recording coconspirators' statements made to government agent or informant will "deter prosecutorial abuse and enhance jury's ability to function"). Recording also eliminates concerns of fabrication by the informant. See id.; cf. *State v. Jones*, 337 Conn. 486, 504, 254 A.3d 239 (2020) (noting that special credibility instruction is required when jailhouse informant testifies because such testimony must be reviewed with particular scrutiny in light of witness' powerful motive to falsify his or her testimony). That recording makes clear that Calabrese volunteered most of the inculpatory information with no prompting. We therefore have a fair assurance that the involvement of government officials did not influence the content or the making of the statement.

C

Because we have concluded that the admission of Calabrese's dual inculpatory statement did not violate

---

[21] The trial court properly raised these concerns at the hearing on the motion in limine in Niraj's trial; its ruling in that case was deemed the law of the case for the defendant's identical motion: "It does, in my mind, create an issue as to whether the recording is testimonial, and that's an issue that really can only be resolved, I believe, with an understanding of what led up to the recording. Who initiated the conversation? My understanding is the topic first came up the day before the recording. What were the circumstances under which, after that conversation, the cooperating individual agreed to record a conversation? What happened on the morning of the conversation before it took place? What interaction did that individual have with law enforcement? Certainly, I believe all that is relevant to a *Crawford* analysis." Neither Niraj nor the defendant called the corrections officials or law enforcement officials who spoke with Early to testify at the hearing on the motion in limine. We note, however, that nothing that Early stated in his conversation with Calabrese suggested any personal knowledge about the facts of the crime.

State *v.* Patel

the defendant's federal or state confrontation rights, the admissibility of the statement is, therefore, limited only by the rules of evidence. See, e.g., *Ohio* v. *Clark*, supra, 576 U.S. 245. Calabrese's statement was admitted under the hearsay exception for statements against penal interest. See Conn. Code Evid. § 8-6 (4). "We evaluate dual inculpatory statements using the same criteria that we use for statements against penal interest." *State* v. *Camacho*, 282 Conn. 328, 359, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007). We conclude that the trial court's admission of Calabrese's statement under § 8-6 (4) was not an abuse of discretion.

Admission of a hearsay statement pursuant to § 8-6 (4) of the Connecticut Code of Evidence "is subject to a binary inquiry: (1) whether [the] statement . . . was against [the declarant's] penal interest and, if so, (2) whether the statement was sufficiently trustworthy." (Internal quotation marks omitted.) *State* v. *Bonds*, 172 Conn. App. 108, 117, 158 A.3d 826, cert. denied, 326 Conn. 907, 163 A.3d 1206 (2017); see also *State* v. *Pierre*, supra, 277 Conn. 67. Only the second part of that inquiry is at issue in this appeal.

Our code of evidence directs trial courts to consider the following factors in assessing the trustworthiness of the statement: "(A) the time the statement was made and the person to whom the statement was made, (B) the existence of corroborating evidence in the case, and (C) the extent to which the statement was against the declarant's penal interest." Conn. Code Evid. § 8-6 (4). "[N]o single factor . . . is necessarily conclusive . . . . Thus, it is not necessary that the trial court find that all of the factors support the trustworthiness of the statement. The trial court should consider all of the factors and determine whether the totality of the circumstances supports the trustworthiness of the statement." (Citations omitted; internal quotation marks omitted.) *State* v. *Lopez*, 254 Conn. 309, 316, 757 A.2d 542 (2000).

State *v.* Patel

The trial court concluded that the length of the delay between the crimes and the making of the statement, thirteen months, weighed against its trustworthiness but that all of the other factors strongly weighed in favor of admission. The state concedes that the timing of the statement weighs against admission. See, e.g., *State* v. *Pierre*, supra, 277 Conn. 70 (''[i]n general, declarations made soon after the crime suggest more reliability than those made after a lapse of time [when] a declarant has a more ample opportunity for reflection and contrivance'' (internal quotation marks omitted)). We therefore focus on the remaining factors. We disagree with the trial court's treatment of one of the factors but conclude that it ultimately did not abuse its discretion in admitting the statement.

The trial court suggested that the fact that the statement was made ''to a fellow inmate who appeared to the defendant [to] be a fellow gang member, and one who was facing serious charges,'' rendered the statement more trustworthy. The record does not support a factual predicate for this conclusion, and the law does not support its reasoning. Calabrese was not a fellow gang member.[22] He unambiguously informed Early that he was not a ''blood,'' although ''all [his] boys'' belonged to the gang, and he did not join because he ''really [didn't] give a shit'' about belonging to the gang.

The fact that Early and Calabrese were fellow inmates, in and of itself, does not establish that they shared the type of relationship of trust and confidence that demonstrates the trustworthiness of the statement. Cf. *State* v. *Thompson*, 305 Conn. 412, 435, 45 A.3d 605 (2012) (statement was trustworthy when made to fellow inmate who was known to declarant for several years

_____

[22] It is unclear what the trial court meant when it stated that ''Early was facing serious charges.'' When Calabrese's statement was elicited, Early had already been convicted of attempted burglary in the first degree with a deadly weapon and criminal possession of a firearm.

State *v.* Patel

before incarceration, and with whom declarant had become "reasonably close" in two months of incarceration prior to making of statement (internal quotation marks omitted)), cert. denied, 568 U.S. 1146, 133 S. Ct. 988, 184 L. Ed. 2d 767 (2013); *State* v. *Camacho*, supra, 282 Conn. 361 (statement made "to people with whom [declarant] had a trusting relationship"); *State* v. *Pierre*, supra, 277 Conn. 69 (statement made to friend, with whom declarant "routinely socialized"); *State* v. *Bryan*, 193 Conn. App. 285, 304–306, 219 A.3d 477 (relationship of trust and friendship when declarant had known person to whom he made statement for approximately ten years, had stayed at person's home, and had committed robbery with that person), cert. denied, 334 Conn. 906, 220 A.3d 37 (2019). Our appellate case law indicates that "[s]tatements made by a declarant to fellow inmates have been considered untrustworthy. See *State* v. *DeFreitas*, 179 Conn. 431, 453, 426 A.2d 799 (1980) (declarations against penal interest are untrustworthy when, inter alia, confessions made to fellow inmate); *Morant* v. *State*, 68 Conn. App. 137, 172, 802 A.2d 93 (exclusion of [third-party] confession proper when, inter alia, declarant confided not in close friends but in fellow inmate) (overruled in part on other grounds by *Shabazz* v. *State*, 259 Conn. 811, 830 n.13, 792 A.2d 797 (2002)), cert. denied, 260 Conn. 914, 796 A.2d 558 (2002). The fact that the statements allegedly made by [the declarant] were made to a fellow inmate, *with whom* [*the declarant*] *did not have a close relationship*, weighs against their trustworthiness." (Emphasis added.) *Martin* v. *Flanagan*, 107 Conn. App. 544, 549–50, 945 A.2d 1024 (2008).

*State* v. *Smith*, supra, 289 Conn. 598, on which the state relies, is not to the contrary. In *Smith*, we concluded that the trial court's admission of an inmate's recorded statement, when the court found that it was made in a private manner to a cellmate in whom the

State *v.* Patel

declarant would be likely to confide, was not an abuse of discretion. Id., 630, 632–33. It was not our intention in *Smith* to adopt a blanket rule or presumption that a relationship between inmates, or even cellmates, is one of trust and confidence simply because of their shared circumstance. The inmates in *Smith* were both facing drug charges and had been cellmates for perhaps as long as one month when the statements were made. Id., 615.

In the present case, Early and Calabrese were strangers who were cellmates for less than twenty-four hours when the statement was made. Early's purported status as a gang member could have induced Calabrese to embellish his criminal history to send a message that neither Early nor any of his fellow gang members in the facility should mess with him. There is no basis in the record to conclude that, in this fleeting period, a relationship of trust and confidence developed.

The two remaining factors, however, corroboration and the degree to which the statement was against Calabrese's penal interest, overwhelmingly weigh in favor of trustworthiness. Calabrese's account was consistent with the physical evidence in almost all material respects; the only material inconsistency was his claim that Vitalis had pulled a knife on him when no knife was found at the scene. There are numerous reasons why Calabrese may have intentionally fabricated the existence of the knife.[23] The state also produced independent evidence to corroborate Calabrese's identification of the defendant as his accomplice and Calabrese's presence at the scene—cell phone location information and a statement that Calabrese had made to his girl-

_____

[23] It is immaterial whether Calabrese subjectively, but incorrectly, assumed that he would be less culpable if it was believed that he killed Vitalis in self-defense. "Whether a statement is against a declarant's penal interests is an objective inquiry of law, rather than a subjective analysis of the declarant's personal legal knowledge." *State* v. *Camacho*, supra, 282 Conn. 359.

State *v.* Patel

friend before the crime, among other evidence. Although the defendant points to certain aspects of Calabrese's account that are inconsistent with the evidence (i.e., time of day, which door was the point of entry, etc.), none of these facts is material. It is unsurprising that such inconsequential details could have been misremembered more than one year after the events occurred.

The extent to which the statement is against Calabrese's own penal interest could not be greater. He cast himself as the principal actor—the only perpetrator armed, the person who first restrained Vitalis' mother, the person who shot Vitalis, and the only one who stole property from the scene. He exposed himself to felony murder charges, among other charges. Calabrese's statement and the circumstances of its making have none of the characteristics that had historically caused courts to view dual inculpatory statements as presumptively unreliable when offered to prove the guilt of an accomplice of the declarant. See *Lilly* v. *Virginia*, 527 U.S. 116, 134, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999) (plurality opinion) (concluding that such statements are not within firmly rooted hearsay exception for confrontation clause purposes); see also id., 136–37 (confirming that such statements may nonetheless be admitted if they possess particularized guarantees of trustworthiness). Calabrese neither shifted blame from himself to the defendant nor attempted to share the blame for the murder with the defendant. See *State* v. *Schiappa*, supra, 248 Conn. 155 (citing these factors). Calabrese did not know that his statement was being recorded at the behest of state officials, and, thus, he could not have been making the statement to curry favor with the government. See *State* v. *Rivera*, 268 Conn. 351, 370, 844 A.2d 191 (2004) ("*Lilly*'s main concern was with statements in which, as is common in police station confessions, the declarant admits only what the authorities are already capable of proving against him and

State *v.* Patel

seeks to shift the principal blame to another (against whom the prosecutor then offers the statement at trial)'' (internal quotation marks omitted)); *State* v. *Gold*, 180 Conn. 619, 635, 431 A.2d 501 (concern with attempt to ''curry favor''), cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); 2 R. Mosteller, McCormick on Evidence (8th Ed. 2020) § 319, p. 569 (''federal courts have most frequently admitted [third-party] statements that inculpate a defendant [when] two general conditions are satisfied: (1) the statement does not seek to curry the favor of law enforcement authorities, and (2) it does not shift blame''). Therefore, the trial court clearly did not abuse its discretion by admitting Calabrese's dual inculpatory statement under § 8-6 (4).

II

The defendant's final challenge is to the trial court's exclusion of Shyam's confession to the defendant's sister, Majmudar, which the defendant offered as a statement against penal interest under § 8-6 (4) of the Connecticut Code of Evidence. The defendant contends that the trial court abused its discretion in concluding that Shyam's statement was not trustworthy. We agree with the Appellate Court that the trial court's ruling was not an abuse of discretion.[24]

The principles that we articulated in part I C regarding the hearsay exception for statements against penal interest under § 8-6 (4) of the Connecticut Code of Evi-

_____

[24] The state contends that the trial court also properly excluded Shyam's purported confession on the ground that the defendant failed to establish Shyam's unavailability, a precondition for the admission of a statement against penal interest. See Conn. Code Evid. § 8-6 (4). Although there were several exchanges between defense counsel and the court on this issue, it is not entirely clear whether the trial court conclusively determined that the defendant had failed to meet this condition. Like the Appellate Court, we conclude that it is unnecessary to address Shyam's availability in light of our conclusion that the trial court did not abuse its discretion in determining that Shyam's statement was not trustworthy. See *State* v. *Patel*, supra, 194 Conn. App. 279 n.19.

State *v.* Patel

dence apply equally to the admissibility of Shyam's confession. We assess the trial court's discretion in applying those principles to the following undisputed facts. During the presentation of the defense's case-in-chief, Majmudar testified that her cousin Shyam had made a surprise visit to her Boston home sometime in the last two weeks of September, 2013. When asked what Shyam had said during that visit, the prosecutor objected. In a proffer outside of the jury's presence, Majmudar provided the following testimony. She and Shyam had a close relationship, becoming especially close when Shyam lived with Majmudar's family in Branford, Connecticut, for two years while Majmudar was in high school. When Shyam visited Majmudar in Boston in September, 2013, he told Majmudar that his family was asking relatives for help posting bond for Niraj, and asked whether he could borrow $50,000 from her. Majmudar replied that she could not lend the money because she needed it to help the defendant post bond and pay attorney's fees. Majmudar told Shyam that she knew the defendant was innocent because he had been with her in Boston when the crimes occurred. When Shyam did not appear surprised by this revelation, Majmudar asked him if he knew who had accompanied Calabrese. After further probing, Shyam broke down in tears and admitted that he and Calabrese were the ones who had tried to rob Vitalis. Shyam then provided her with an account of the incident, in which he stated that he had fled the Vitalis home after Calabrese shot Vitalis and later returned in a vehicle with Niraj to pick up Calabrese. Majmudar asked Shyam whether Calabrese had used the defendant's cell phone during the robbery.[25] Shyam responded affirmatively and volunteered

_____

[25] Evidence was presented at trial regarding the movement of cell phones associated with Niraj, Calabrese, and the defendant on August 6, 2012, which placed those phones near the crime scene and often in contact with one another. See *State* v. *Patel*, supra, 194 Conn. App. 285–86. The cell phone associated with the defendant accessed the cell tower located between seven and eight miles from the crime scene for a series of phone calls prior

State *v.* Patel

that he had left his own cell phone at home. Majmudar told Shyam that he needed to come forward and confess, but Shyam said that he could not do that to his parents, as they already faced the risk that Niraj would be taken away from them.

The trial court asked Majmudar who she had told about Shyam's confession. She replied that she had told only the defendant, after he was released on bond.

The court sustained the prosecutor's objection to the admission of the testimony pertaining to Shyam's confession. The court found that, in light of the totality of the circumstances under which the statement was purportedly made, the statement was untrustworthy and particularly lacking in sufficient corroboration. The court cited the following factors. The court pointed out that the alleged confession was made thirteen months after the crime and that Majmudar claimed to have told no one except the defendant about the alleged confession for more than three and one-half years after the statement was made. It reasoned: "Both of these delays provided her with years to learn the details of the prosecution's theory of the case and, if she wished to do so, [to] fabricate the statement. . . . [B]oth the delay in which the statement was supposedly made and the time at which it was revealed, which was yesterday, independently, and, when combined, weigh heavily against the admissibility of the statement. The incriminating statements were, based on the evidence made to date, made to only one person, [Majmudar]; that fact

to 6:04 p.m. See id., 286–87. There were no outgoing calls or messages from the cell phone associated with the defendant after 6:04 p.m. on August 6, 2012, which, the state's expert observed, "indicated 'either that the phone was off or that it was . . . in an area where it could not receive any cell signal,' or that 'something could have happened to the phone that rendered it unable' to receive a [cell] signal." Id., 286. On August 6, 2012, Shyam's phone was used to make several phone calls through a device in his home in Warren.

State *v.* Patel

weighs against admissibility. The concept that [Majmudar] allegedly allowed her parents and her sister to agonize over the emotional and financial burden of this prosecution for the past three and [one-half] years, all the while keeping to herself the supposed confession that would have been of incalculable relief to them, is incomprehensible and weighs against admissibility. The nature of the relationship between [Majmudar] and Shyam . . . weighs heavily against admissibility. The witness is highly motivated to assist her brother, and, even though there may be a strong relationship between these two cousins, Shyam and [Majmudar] . . . Shyam . . . had to know that [Majmudar's] primary loyalty would be to her brother. Unless Shyam . . . wanted his confession to be open and known, he would never have made it to one of the four people on this planet who are most highly motivated above and beyond all others to bring it to the attention of the authorities to save their son, their sibling, from what they would have believed to be a wrongful prosecution.''

The court further reasoned that ''[t]he details of the statement . . . make it untrustworthy and even bizarre.'' The court questioned why Shyam would volunteer trivial details such as which vehicle he had driven,[26]

_____

[26] According to Majmudar, Shyam said that he and Niraj had driven ''the Pathfinder'' back to the woods to find Calabrese. Shyam's family owns a white Pathfinder. Majmudar testified that, when she questioned Shyam as to why the police had seized her parents' two black sport utility vehicles (SUVs), Shyam said that they had used ''the black Saab SUV from New York'' during the robbery. From the defendant's perspective, these statements identifying the vehicles provide two benefits. The report of the use of the black Saab explains a witness' report of seeing Niraj driving a vehicle fitting the description of the defendant's black Honda CRV about five miles away from Vitalis' home, when no such vehicle was registered to Niraj or to Niraj's family. The report of the use of the Pathfinder, after the murder was committed, in conjunction with evidence that Shyam had access to that vehicle on August 6, 2012, and that the Pathfinder was thoroughly cleaned in the weeks before the police seized it in mid-September, 2013, provides potential physical evidence connecting Shyam to the crime.

State *v.* Patel

and found it "[e]specially suspect" that Majmudar asked Shyam if Calabrese used the defendant's phone during the robbery. See footnote 26 of this opinion. The court noted that there was no evidence explaining how Majmudar would have known that phones played any role in the robbery—"for all she knew, the plan was hatched by coconspirators in a bar, immediately carried out and no phones were used at all." The court found it nonsensical that, if Calabrese and Shyam decided not to use their own phones during the robbery, they would use the phone of someone with whom they are associated or related, instead of untraceable phones.

The court also pointed out that evidence demonstrated that "Vitalis had significant contacts and dealings with Niraj . . . and Shyam . . . which explains . . . at least in part, why Niraj . . . and Shyam . . . did not enter that home, because . . . despite masks, through their voices in the prior context, it would have been readily recognized, and that would explain why Niraj . . . solicited others who [did] not have contact with . . . Vitalis to carry out the robbery. . . . [T]hat evidence alone points more to . . . Calabrese and this defendant than it does to Shyam . . . having been the person to enter the Vitalis home. The circumstances surrounding the event are far more consistent with [the] defendant entering the Vitalis' home than Shyam . . . entering that home."

The Appellate Court agreed that Shyam's statement "was against [his] penal interest to a significant extent, such that this factor weighs in favor of a finding of trustworthiness," but concluded that the trial court had not abused its discretion in concluding that the remaining factors clearly weighed against such a finding. *State* v. *Patel*, supra, 194 Conn. App. 280, 283. We agree that the trial court's exclusion of the statement was not an abuse of discretion.[27]

[27] We observe that several statements made by the trial court in connection with its ruling could be interpreted as comments explaining why Majmudar's

State *v.* Patel

The defendant's arguments for the admission of the statement are unpersuasive. He suggests that, with regard to the temporal factor, it is more important that Shyam's confession was made shortly after the arrests in connection with the Sharon home invasion than the fact that it was made more than one year after the incident. The defendant cites no case law supporting this proposition, and this proposition is contradicted by the rationale for the temporal factor—that a lapse of time following the crime provides a declarant with opportunity for reflection and contrivance. See *State* v. *Pierre*, supra, 277 Conn. 70. The defendant's emphasis on the close relationship between the cousins, Majmudar and Shyam, and on the case law recognizing that a blood relationship may be one of trust; see, e.g., *State* v. *Rivera*, supra, 268 Conn. 369; misses the point. The trial court reasonably pointed to the stronger relationship between the defendant and his sister, and her loyalty to him over Shyam.

Most of the evidence that the defendant characterizes as corroborative indicates only that Shyam may have played some role in connection with the incident, not that Shyam was present in the Vitalis home.[28] We pre-

testimony lacked credibility. "We previously have concluded . . . that a trial court may not consider the credibility of the testifying witness in determining the trustworthiness of a declaration against penal interest." *State* v. *Rivera*, supra, 268 Conn. 372; see also 2 R. Mosteller, supra, § 319, p. 575 ("The federal courts have disagreed on whether the corroboration requirement applies to the veracity of the in-court witness testifying that the statement was made in addition to the clearly required showing that the statement itself is trustworthy. As a matter of standard hearsay analysis, the credibility of the in-court witness regarding the fact that the statement was made is not an appropriate inquiry." (Footnote omitted.)). The defendant did not challenge the trial court's ruling on this basis. Even if the trial court had improperly rested its decision in part on Majmudar's credibility, however, the reasons articulated by the trial court illustrate why a jury would have been highly unlikely to credit her testimony, and any potential error in excluding Shyam's purported confession would have been harmless.

[28] "There was evidence at trial that Shyam sent the following text messages to Niraj at 8:13 p.m. on August 6, 2012: 'U want me to come to the station in [P]athfinder?'; '?'; 'Lemme know . . . I got keys.' A white Pathfinder,

State *v.* Patel

viously have emphasized that "[t]he corroboration requirement for the admission of a [third-party] statement against penal interest is significant and goes beyond minimal corroboration." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Lopez*, supra, 254 Conn. 319. The only evidence that could corroborate Shyam's presence at the Vitalis home invasion is one of the several statements given by Vitalis' mother to the police about the incident. In January, 2016, more than three years after the incident, Rita Vitalis told the police that she believed that one of the masked intruders was an Indian male and believed that this person was Shyam. She knew Niraj and Shyam but not the defendant. In other statements, however, she reported that she believed that both of the intruders were white, that they could be Hispanic, or that she did not know who either intruder was with certainty. The trial court, therefore, reasonably concluded that Shyam's statement was not sufficiently trustworthy to be admitted as a statement against penal interest.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

registered at the home Shyam shared with his parents and, occasionally, Niraj, was seized by [the] police. The vehicle smelled clean and seemingly had new floor mats. A receipt dated August 31, 2012, at 10:40 a.m. from Personal Touch Car Wash in New Milford was found in a bedroom at Shyam's home, and Shyam's cell phone utilized two cell towers in the vicinity of the car wash around the date and time printed on the receipt." *State* v. *Patel*, supra, 194 Conn. App. 282 n.22. "There was [also] evidence at trial that there were Google searches conducted on Shyam's computer for the terms 'conspiracy to commit murder in Connecticut' and 'conspiracy to kill,' along with searches for penalties for those crimes." Id., 282 n.23.